**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**DASHAUN BROWN,**<br><br>        **Defendant.** | Crim. No. 22-108 (KM)<br><br>**OPINION & ORDER** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

This matter comes before the Court on post-verdict motions for acquittal, pursuant to Fed. R. Crim. P. 29(c), and for a new trial, pursuant to Fed. R. Crim. P. 33. (DE 54, 57)

Trial of this matter occupied four days. The government introduced the testimony of some nine witnesses, and the defendant testified on his own behalf. Before reaching its verdict, the jury deliberated for approximately one and one half days.

On April 2, 2022, the jury convicted defendant Dashaun Brown of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Indictment[1] Count 1); bank fraud, in violation of 18 U.S.C. § 1344 and § 2 (Count 3); receipt and possession of stolen mail, in violation of 18 U.S.C. § 1708 and § 2 (Count 4); and aggravated identity theft, in violation of 18 U.S.C. § 1028A and § 2 (Count 6). The jury unanimously found that Defendant: (i) participated in a conspiracy to defraud banks by using credit cards and checks that had been stolen from the U.S. mail (Count 1); (ii) defrauded J.P. Morgan Chase Bank, N.A. ("Chase") by using a credit card issued to Marta Febos to purchase goods at a Costco in Bridgewater, NJ (Count 3), and committed aggravated identity theft against Febos (Count 6); (iii) received and possessed stolen mail (Count 4),

---

[1]  All references to the Indictment herein, unless otherwise specified, are to the Superseding Indictment (DE 20).

namely, the stolen credit cards and checks referred to in the incorporated paragraphs of the conspiracy count.

The jury acquitted Defendant of the substantive bank fraud (Count 2) and the associated aggravated identity theft (Count 5), involving the use of Joseph Machewirth's credit card to buy a BMW at Best Cars R Us in Irvington, NJ.

Now before the court is the defendant's counseled motion for a judgment of acquittal or a new trial, pursuant to Rules 29 and 33, Fed. R. Crim. P. (DE 54). Defendant has filed a brief in support of the motion (DE 57), and the government has filed a response in opposition (DE 59).[2]

## I.    Legal Standards

### A. Rule 29 and Rule 33

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). In reviewing a motion for acquittal, the court "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). The evidence is to be viewed in the light most favorable to the prosecution. *United*

---

[2]    Defendant's notice of motion cites both Rule 29 and Rule 33, and his supporting brief contains a boilerplate recital of the legal standards governing both Rules. The substantive argument, however, seems to be confined to a Rule 33 motion for a new trial. *See* Def. Brf. (DE 57), *passim*. I have nevertheless considered the defendant's contentions under both Rule 29 and Rule 33 standards.

Unusually, while the motion was fully briefed and pending, the defendant filed a *pro se* letter to the Court, stating that "I know I am guilty of Conspiracy, so if a new tr[ia]l was granted I would still be found guilty on that count. So if granted a new tr[ia]l, I wouldn't go to tr[ia]l an[d] insult your good favor because I understand that would also be a waste of time and money." (DE 61) The defendant's courteous gesture is noted, but the government has not seized on this uncounseled submission, and neither will I. I will analyze the motion as filed by counsel, and defendant may rest assured that he will not be penalized for counsel's assertion of these legal contentions.

*States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001). The government receives "the benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 738 F.3d 614, 618 (3d Cir. 1986). Credibility conflicts, too, are to be resolved in the government's favor. *United States v. Scanzello*, 822 F.2d 18, 21 (3d Cir. 1987). Having applied those principles of interpretation, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Fattah*, 902 F.3d 197, 268 (3d Cir. 2018) (reviewing court, applying same standard as district court, must affirm "unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt"); *United States v. Caraballo-Rodriguez,* 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming *Jackson* standard and reversing a line of drug conspiracy cases to the extent they undermined it); *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

The standard under Rule 33 is more general than that under Rule 29. A court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus,* 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)).

A Rule 33 motion may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim,* 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd,* 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant,* Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009). In doing so, however, the court must consider the alleged errors in the context of the strength of the evidence of guilt, the scope of the objectionable conduct in relation to the entire proceeding, and the ameliorative effect of any curative instruction. *See United States v. Gambone,* 314 F.3d 163, 179 (3d Cir. 2003) (citing *United States v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc); *United States v. Helbling,* 209 F.3d 226, 241 (3d Cir. 2000)).

## B. Conspiracy

The jury was instructed, without objection, that a conspiracy under 18 U.S.C. § 1349 requires that two or more persons agreed to commit bank fraud, that Mr. Brown was a party to that agreement, and that he joined the agreement knowing of its criminal objectives. (Tr. 971; *see* Third Circuit Model Criminal Jury Instructions, 6.18.371A.)

## C. Bank Fraud

The jury was instructed without objection that the offense of bank fraud, in violation of 18 U.S.C. § 1344, charged in Counts 2 and 3 (and as an object of the Count 1 conspiracy) has three essential elements:

> First, that Dashaun Brown knowingly executed a scheme or artifice to defraud financial institutions, in this case JP Morgan Chase & Co., or knowingly executed a scheme to obtain money, funds or other property owned by or under the control of financial institutions, again JPMorgan Chase & Co., by means of material false or fraudulent pretenses.

> Second, that Dashaun Brown did so with the intent to defraud that bank; and

Third, that the bank was then insured by the Federal Deposit Insurance Corporation.[3]

(Tr. 976–77; Third Circuit Model Criminal Jury Instructions, 6.18.1344).

**D. Identity theft**

The jury was instructed, without objection, that the offense of aggravated identity theft, in violation of 18 U.S.C. § 1028A, charged in Counts 5 and 6 has four essential elements:

First, that the defendant committed . . . the felony violation of bank fraud charged in [Count 2 or Count 3].[4]

Second, that the defendant knowingly transferred, possessed, or used a means of identification of another person without lawful authority.

Three, that the defendant knew that the means of identification belonged to another person.

Fourth, that the transfer, possession, or use was during and in relation to . . . the crime charged in [Count 2 or Count 3].

(Tr. 980:10-21; Sixth Circuit Model Criminal Jury Instructions, 15.04).

**E. Possession of stolen mail**

The jury was instructed, without objection, that the offense of receipt and possession of stolen mail, in violation of 18 U.S.C. § 1708, charged in Count 4, has three essential elements: that the mail was stolen from the U.S. mail; that the defendant received or possessed the mail; and that the defendant knew the mail was stolen. (Tr. 978; Tenth Circuit Model Criminal Jury Instructions, 8.140)

**F. Aiding and abetting**

Each of the substantive Counts, numbers 2 though 6, cited 18 U.S.C. § 2, the aiding and abetting statute. The Court charged the jury, and later amplified its instruction in response to a jury question, that aiding and

---

[3]     It was undisputed that the victim banks were insured by the FDIC. (Tr. 592–93)

[4]     The Count 5 identity theft was paired with the bank fraud in Count 2, and the Count 6 identity theft was paired with the bank fraud in Count 3.

abetting liability has four essential elements: that some person committed an offense; that the defendant knew of the offense being committed; that the defendant did some act for the purpose of aiding or facilitating the commission of that offense, with the intent that the offense be committed; and that the defendant performed at least one act in furtherance of the offense. (Tr. 986, 1025; Third Circuit Model Criminal Jury Instructions, 7.02.)

## II.    Evidence at Trial

The evidence at trial established a conspiracy among defendant Brown, postal employee Khadijah Banks-Oneal, Jahad Salter, and Hakir Brown (referred to herein as "Hakir," to distinguish him from the defendant). It also established a pattern of criminal behavior that belied defendant Brown's innocent explanations of his conduct. The overall scheme was to use bank-issued credit cards and U.S. Treasury checks that Banks-Oneal stole from the mail, together with personal identifiers of the rightful owners, to fraudulently obtain money and property.

Banks-Oneal, a cooperating witness, was a postal employee at the time of the offenses. She testified that, on literally thousands of occasions, she stole credit cards, debit cards, and treasury checks from the mail. (Tr. 390–93, 481–84). She sold the stolen mail items to persons including defendant Dashaun Brown, whom she knew as "Dae Dae,"[5] and his coconspirators. (Tr. 390–93, 407–08, 480–81) Brown, accompanied by Salter and Hakir, initially approached her directly because "Jizzle" or "Gizzle," an intermediary from whom he had been purchasing Banks-Oneal's stolen cards, had been arrested. (Tr. 410). In furtherance of the fraud, Brown and his coconspirators obtained personal identifying information of the persons whose cards were stolen. They used the cards and personal information, often through intermediaries or "runners," to purchase jewelry, electronics, and other items. (Tr. 452–53) In connection with the scheme, Banks-Oneal communicated with Brown and the other

---

[5]    Brown acknowledged in testimony that Banks-Oneal knew him by the nickname of "Dae Dae." (Tr. 849, 866)

coconspirators by text and phone calls on her two cellular telephones. (*E.g.,* Tr. 430–38) She was able to identify defendant Brown as the user of at least four phones, identified at trial by their final four digits as the "4582 phone," the "8948 phone," the "3649 phone," and the "3527 phone." (*See* Tr. 442–43, 463, 485).[6] She testified to numerous face-to-face meetings with Brown, during which they sorted through stolen mail and she sold him the stolen credit cards or checks that he selected. Usually he was alone, but sometimes was accompanied by persons with whom he "worked together" to make fraudulent purchases. (Tr. 439–42, 454) Later in the conspiracy, she often met with Brown and Salter together, often in her car, and the two of them would rip open mail or look at mail that Banks-Oneal had already ripped open, inspect the items, and pick the ones they wanted. (Tr. 450–51) Brown admitted to Banks-Oneal that he used the stolen cards and checks to purchase items such as computer products and jewelry. (Tr. 452–53) Salter told Banks-Oneal that, to assist in activating the cards, they obtained personal information about the rightful recipients on the "dark web." (Tr. 453)

Text messages with Brown's phone reflect the two setting up such transactions. (Tr. 443–48) For example, text messages show Salter putting Hakir in touch with defendant Brown on August 28, 2020, so that Hakir could sell stolen credit cards to Brown. (Tr. 662–72) On May 28, 2021, in another text exchange with "Dae Dae's phone number" she offers "100 slip and slides" for "ten big ones," *i.e.,* 100 Treasury checks for $1000, and they try to set up an in-person meeting for the following day. (Tr. 445–48; Gov't Exs. 408, 402-9)

Counts 2 and 5, of which Brown was acquitted, involved the May 4, 2021 purchase of a 2013 BMW from Best Cars R Us, a car dealership in Irvington, in

---

[6]     In his testimony, Brown admitted to using seven different phones in one year, including these four, though he denied participating in the fraud. (Tr. 847–98.) The government introduced considerable evidence of telephone calls from phones associated with Brown to a bank concerning credit cards in the name of persons other than Brown, on or close to days when fraudulent charges were being made. (*E.g.,* Tr. 682–86) There was no evidence of any connection between the card holders and those phone numbers.

the name of Joseph Machewirth. The purchaser covered $8,600 of the purchase price using Machewirth's stolen credit card and a Connecticut driver's license bearing Machewirth's name, but the picture of defendant Brown. (Tr. 330 *et seq.*) Alexander Cahrour, the owner of Best Cars R Us, confirmed that the BMW was purchased in Machewirth's name using the stolen Machewirth credit card and the driver's license with Machewirth's name but defendant Brown's picture. Cahrour was not at work that day, however, and could not identify Brown as the purchaser. (Tr. 341, 344, 347, 362) In addition, the signed credit card receipt was unavailable. (Tr. 350, 1013) It was no doubt for these reasons that Brown was acquitted of Counts 2 and 5.

Even accepting that Brown was not the face-to-face purchaser of the BMW, the evidence relating to Machewirth was nevertheless pertinent to tie Brown to the conspiracy. On the day she was arrested, Ms. Banks-Oneal was driving the same 2013 BMW, which contained a large amount of stolen mail. (Tr. 413–14, 690) She testified that she had purchased that car from defendant Brown. At the time, Brown gave her the title paperwork and told her the BMW had been purchased from Best Cars R Us. (Tr. 423–24) The title paperwork he gave her, in the name of Machewirth, was in the glove compartment. (Tr. 426, 695–97)  As payment for the BMW, Banks-Oneal gave defendant Brown $3,000 in cash and ten stolen credit cards (Tr. 424), further evidence of a bank fraud conspiracy between Brown and Banks-Oneal.

Brown further admitted to possession of a Chime-branded debit card issued in Machewirth's name. (Tr. 867, 896; *see also* Tr. 712–23) Testimony and a video recording placed Brown at a Speedway gas station, in the black BMW, using a Machewirth's card to pay for gas and other items. (Tr. 817–20, 875–76) This evidence, too, tended to tie Brown to the conspiracy to use stolen credit cards.

On May 6, 2021, the police executed a search warrant on a car registered to "Edward Berg," a Georgia resident. (Tr. 541–42) From the car they seized a fake driver's license of "Edward Berg" which bore the photograph of Dashaun Brown. (Tr. 533) Also in the car was a cell phone that was logged into an

Instagram profile associated with defendant Brown, with at least one outgoing message from "Dae Dae." (Tr. 544–47) There was also an IRS form 1095-C issued to Byinnah Brown, at the 92 Clinton Place address associated with Brown.[7] (Tr. 538, 718) The detective had, about a week earlier, seen Dashaun Brown getting into that car. (Tr. 553) The car contained a large number of fraudulent identification documents, credit card mailers, U.S. Treasury checks, other pieces of mail, and two cell phones. (Tr. 532) The mail was addressed and the checks were issued to a variety of individuals, none of them Dashaun Brown.

Shortly thereafter, on May 15, 2021, a second car, a Dodge Challenger, was purchased from Best Cars R Us. (Tr. 354) The Challenger was purchased with paperwork in the name of Fantelis Tripolitis. (Tr. 354–61) The purchase was made with a credit card issued in the name of Fantelis Tripolitis, which had been stolen from the mail. (Tr. 358, 373, 742–43) Phone records confirm that the credit card was activated and reactivated via phone calls from the 8942 telephone number associated with Brown. The last of those calls occurred on May 15, 2021, the date of the car purchase. (Tr. 743–45) Text messages confirm that Brown sent Tripolitis's social security number and birth date to Salter. They had been obtained from a Chinese internet site. (Tr. 747–50) From internal evidence, the messages were exchanged while the vehicle purchase was actually in progress. In text messages, Brown and Salter coordinate obtaining insurance from Progressive, which the dealership required before the car could be driven off the lot. (Tr. 750–51)

The identification presented to the dealership consisted of a fake Connecticut driver's license in the name of Tripolitis, bearing the same Connecticut home address as the Machewirth license. (Tr. 357–58, 361, 375) It does not appear, however, that Brown made the face-to-face purchase or that it was his photo on the driver's license. (Tr. 364)

---

[7]     In his testimony, Brown acknowledged this as his legal address and stated that female relatives lived there. (Tr. 890)

On June 18, 2021, Brown and two women together made fraudulent purchases at a Costco in Bridgewater, New Jersey. The stolen credit card used was in the name of Marta Febos. The evidence showed that phone calls were made from Brown's phone, x8942, in connection with activating the card, one of them an hour before it was used. (Tr. 625)[8] One of the women had opened a Costco membership earlier the same day, posing as Febos and using a fake driver's license. (Tr. 566–71) The fake Ms. Febos used that membership number and charged $7377.78 in goods. (Tr. 572–90; Gov't Ex. 404-3) The card that was presented to the cashier had been issued to Febos by Chase, but she never received it. The accompanying identification documents bore Febos's name but someone else's photograph. (Tr. 555–59) Surveillance footage showed that Brown accompanied the two women at all times during the Costco transaction, participated in the $7377 shopping spree, and handled or wheeled certain of the items in the cart.[9]  (Tr. 572–90; Gov't Ex. 404-3) Brown admitted that he was the person in the surveillance video, and the jury could of course judge that issue for itself. *See United States v. Fulton*, 837 F.3d 281, 300 (3d Cir. 2016).

---

[8]    Brown claimed he briefly lent one of the women his phone, accounting for the call to the bank in which the card was activated. This claim that he was hoodwinked is plainly incredible. The same number, x8942, was used to activate the Tripolitis card, and appeared in bank records as the contact number for the Machewirth Chime card. (Tr. 717, 743–45; Gov't Ex. 104-2) The same number made calls to other banks in connection with multiple fraudulently used credit cards on multiple dates. (Tr. 753, 808–13; Gov't Exs. 102-1, 103-2))

[9]    In no instance was there any question of the purchases having been authorized. Three fraud victims testified:  Joseph Machewirth, Pantelis Tripolitis, and Marta Febos. All three testified that they had not received credit cards that were mailed to them; that unauthorized purchases were made on those cards; and that drivers' licenses in evidence bore their names, but other peoples' photographs. (Tr. 330–36; 373–79; 555–62) The mailing and nonreceipt of the cards, as well as the fraudulent purchases using them, were corroborated by bank records. (*E.g.*, Tr. 591–636) The various retail purchases were corroborated by records of the businesses involved. (*E.g.*, Tr. 637–40) A law enforcement witness presented the analysis of phone records by which the various phone numbers were tied to Mr. Brown and the activities of the conspiracy. (Tr. 718–740)

After her arrest on July 29, 2021, Banks-Oneal cooperated with the investigation. In texts and a recorded phone call, she set up a sale of stolen credit cards to Brown and Salter on July 29, 2021. This included a recorded call with defendant Brown on the 8948 phone, in which they arranged to meet at a Burger King. (Tr. 457–80) At the Burger King, as the arresting officers approached his car on foot, Brown recklessly fled, driving at high speed through the drive-through lane and over the grass to avoid the police. (Tr. 526–28)

Brown was eventually arrested on August 30, 2021, at a Hilton hotel in East Rutherford. (Tr. 698) The room was rented in the name of Joseph Machewirth. (Tr. 704) In the room were, inter alia, cash and a driver's license in the name of Stanley O. Ogedege. The photo on the "Ogedege" license depicted defendant Brown. (Tr. 702, 705) Also in the room was paperwork for the purchase of a white Infiniti Q50 automobile in the name of Stanley Ogdege, and a key fob for that car. (Tr. 705–06) The Infiniti was in the hotel parking lot; the agents obtained a warrant and searched it. Inside the car was a Chime credit card in the name of Joseph Machewirth. (Tr. 712, 714–17) Records show that the card was used fraudulently to purchase a variety of goods and services; the phone number associated with the card belonged to a cell phone seized from the Infiniti. (Tr. 717–23)

In his testimony, Brown had little choice but to admit key elements of the prosecution case, while denying criminal knowledge or intent. Brown admitted that phone x3527 was his, and that he had obtained it from "Gizzle" (Tamir Duval, the person through whom, according to Banks-Oneal, Brown had formerly been obtaining credit cards she stole). (Tr. 847–48) He admitted to using phone x3649, which he said Banks-Oneal had given him. (Tr. 849) He admitted to using phones x8849, x4582, and x0080. (Tr. 850, 852, 856–57) He admitted to using two other phones which he had obtained from Jahad Salter, x8948 and x8942. (Tr. 852; *see also* Tr. 895 (list of admittedly used phone numbers)) He added, however, that he and the other persons named as conspirators changed or traded phones regularly. (Tr. 851)

11

Brown admitted to obtaining the Joseph Machewirth fake ID from Banks-Oneal, via Hakir. (Tr. 867–68) Brown stated that his picture was used in connection with the "Machewirth" BMW purchase without his permission. (Tr. 873) Brown admitted to borrowing the BMW from Banks-Oneal and purchasing gas and other items at the Speedway with the Machewirth card that Hakir gave him. (Tr. 875–76, 896) He denied having anything to do with the "Tripolitis" purchase of the Dodge Challenger. (Tr. 878)

As to the purchase at Costco, Brown admitted that he was on the video with the two women. He stated that the women were friends of Banks-Oneal, who asked him to drive them to Costco so they could purchase items for their new home. He stated that he had permitted them to use his phone. He stated that, although he physically participated in the shopping trip, he was unaware that they were using a stolen credit card or fake ID. (Tr. 878–80, 895)

Brown admitted to speaking to Banks-Oneal on the telephone, setting up the Burger King meeting, and fleeing the police at Burger King on July 29, 2021. (Tr. 883–85, 895–96) He admitted to being at the Hilton in East Rutherford on August 30, 2021. He admitted that, while at the hotel, he was in possession of the white Infiniti Q 50. (*See* Tr. 871–72, 888, 896.) He admitted that the phones in the hotel room were his. (Tr. 888) He admitted that he was in possession of a Chime prepaid debit card in the name of Joseph Machewirth, which he had obtained from Hakir, but claimed he had loaded it with his own money. (Tr. 889–90, 895) He admitted that his legal address, where certain relatives live, was 92 Clinton Place in Newark. (Tr. 890) He explained certain apparently furtive behavior by stating that he was in a relationship with Banks-Oneal which they were concealing from her jealous boyfriend, Hakir. (Tr. 865–67) Brown generally denied ever purchasing stolen mail or credit cards from anyone. (Tr. 892–93)

### III.    DISCUSSION – Rule 29 Sufficiency/Rule 33 Weight of evidence

The Rule 33 motion and the Rule 29 motion (assuming a Rule 29 motion was intended), insofar as they are directed to the strength of the evidence and the integrity of the verdict, are based on the same arguments. In this section, I

analyze them together, keeping in mind, of course, the different legal standards governing them. In Section IV, immediately following, I discuss miscellaneous Rule 33 claims of error at trial.

With respect to the sufficiency or weight of the evidence to convict, the Mr. Brown focuses on three contentions:

(a) That the acquittal on substantive counts 2 and 5 renders the overall conspiracy verdict defective;

(b) That Counts 3 and 6, concerning the fraudulent use of "card 3" (the Febos card) at Costco, and identity theft in connection with that card, was not supported by sufficient evidence, because anyone could have activated and used the card.

(c) That Count 4 is based on the testimony of Khadijah Banks-Oneal, which was rebutted by the testimony of defendant Brown, and that the government failed to connect the credit card evidence to the cards actually stolen by Banks-Oneal.

**A. Conspiracy and acquittals on counts 2 and 5**

Count 1 charges a conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. (*See* Section I.B, *supra*.) The defendant raises arguments of sufficiency, unanimity, or inconsistency of verdicts as between the acquittals on counts 2 and 5 and the conviction of the conspiracy.

Unanimity, as the jury was instructed (Tr. 1000), is required as to each element of each offense. No further or more detailed unanimity instruction was requested. A general unanimity instruction is sufficient in most cases, "even where an indictment alleges numerous factual bases for criminal liability." *United States v. Smukler*, 991 F.3d 472, 492 (3d Cir. 2021). In particular, "[t]here is no requirement that the Court, sua sponte, render a jury instruction regarding unanimity as to the means by which [the defendant] engaged in the conspiracy." *United States v. Allen*, 492 F. App'x 273, 278-79 (3d Cir. 2012). That principle may give way, however, where the theories are branching and complex, so that the jury could be confused or misled as to the legal basis for liability. *See Smukler*, 991 F.3d at 493 (citing *United States v. Beros*, 833 F.2d

455, 461 (3d Cir. 1987), and noting its "sixteen-count[s] indictment, with two of the counts 'alleg[ing] four separate and distinct theories of criminal activity' and 'enumerat[ing] several acts upon which a finding of guilt could be predicated"). No such complex, confusing scenario was presented by this Indictment.

Generally speaking, inconsistent verdicts are not grounds for a new trial or judgment of acquittal. *See United States v. Maury*, 695 F.3d 227, 264 (3d Cir. 2012) (citing *United States v. Vastine*, 363 F.2d 853, 854 (3d Cir.1966)). Even in a conspiracy count requiring an overt act, there is no basis for a new trial merely because the jury convicted on the conspiracy but acquitted on a substantive overt act. *United States v. Powell*, 469 U.S. 57, 64-65 (1984).

At any rate, there is no inconsistency between the Count 1 § 1349 conspiracy conviction and the Count 2/5 acquittals. Agreement, as the jury was instructed, is the gist of the conspiracy offense. A conspiracy conviction under 18 U.S.C. § 1349 requires neither a conviction of a substantive underlying offense, nor even an overt act. *See United States v. Obaygbona*, 556 F. App'x 161, 163-64 (3d Cir. 2014). Thus acquittal of an underlying bank fraud does not necessarily imply acquittal of conspiracy to commit that same bank fraud.

But even if the jury's conspiracy verdict did not encompass agreement to commit the activities underlying the acquitted counts 2 and 5, that would not change the picture. This jury amply proved itself able to sift the evidence. What remained of the conspiracy, even after the subtraction of the evidence underlying the acquitted counts, easily meets the standards for denial of a Rule 33 or a Rule 29 motion.

Testimony, particularly that of Ms. Banks-Oneal, the postal employee, established that Mr. Brown, together with a coconspirator, Salter, repeatedly met with her and purchased from her items she had diverted from the mail. Brown and Oneal discussed the means and methods of the conspiracy– particularly, the use of the stolen credit cards, sometimes through intermediaries, and sometimes in connection with personal identifying

information purchased online. (Tr. 390–93, 407–08, 438–40, 448, 451–52, 549) The government introduced testimony and text messages between Brown and Salter, dating from May 15, 2020, concerning personal identifying information of the true holder of a stolen credit card, Tripolitis, in connection with the fraudulent purchase of a Dodge Challenger. (Tr. 745–51; Ex. G 205-8A at 9–12)

The government introduced further text messages between Salter and codefendant Hakir concerning stolen credit cards. Salter gave Hakir the defendant's phone number, the two agreed to meet, and later the same day defendant Brown obtained the cards from Hakir. (Tr. 661–71); Exs. G 205-3C at 101–08, G 205-2A at 1-3 (text messages)).

There is more, but such evidence, which is entirely independent of Counts 2 and 5, easily suffices to establish the elements of agreement to commit bank fraud by means of the use of stolen credit cards. The evidence associated with the acquitted counts 2 and 5 is not essential to that verdict.

A new trial or judgment of acquittal on the conspiracy count is therefore denied on the basis of insufficient evidence, lack of unanimity, or inconsistent verdicts.

## B. Count 3 (bank fraud)/Count 6 (identity theft)

Counts 3 and 6 related to the Costco purchases. Count 3 charged bank fraud in connection with the use of a credit card issued in the name of Marta Febos, in violation of 18 U.S.C. § 1344. (*See* Section I.C, *supra*.) Count 6 charged aggravated identity theft, having Febos as the victim, in connection with the same bank fraud, in violation of 18 U.S.C. § 1028A ("knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means  of identification of another person" "during and in relation to" access device fraud). (*See* Section I.D, *supra*.) Both counts were also charged as aiding and abetting. 18 U.S.C. § 2. (*See* Section I.F, *supra*.)[10]

---

[10]     No party has raised an argument or objection concerning the status of the Febos credit card as a "means of identification" under 18 U.S.C. § 1028A.

Through the testimony of SA Jenkins and certain exhibits, it was proven that defendant Brown was the user of a certain phone (the "8942 phone"). (Tr. 728–29) (Brown, in his testimony, admitted using the subject phones, including the 8942 phone, but denied ever using them for the particular calls associated with the frauds. Tr. 847–98.) Ms. Johnson of Chase Bank testified that the 8942 phone was used to call Chase to activate the Febos card an hour before a purchase was made at Costco using that card. (Tr. 594–637) The jury was not obligated to accept Brown's protestation that he had done no more than briefly allow one of the women to use his phone, x8942; moreover, if that were true, it would still leave unexplained the evidence that the same phone

---

7) the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e))....

18 U.S.C. § 1028(d)(7). Section 1029(e), in turn, defines an "access device" as "any card . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1).

If, *arguendo*, treating a credit card as a means of identification was error, it was not plain error. The most specific guidance from the Third Circuit is a non-precedential opinion holding that "[a]n access device such as a credit card qualifies as a 'means of identification.'" *United States v. Battle*, 422 F.App'x 100, 103 (3d Cir. 2011). Other decisions, reported and unreported, have likewise treated credit cards as means of identification, usually under the theory that they are "access devices." *See, e.g., United States v. Nicolescu*, 17 F.4th 706 (6th Cir. 2021); *U.S. v. Mariano*, 729 F.3d 874 (8th Cir. 2013); *United States v. Popa*, 361 F. App'x 854, 856 (9th Cir. 2010); *United States v. Lewis*, 262 F. Supp. 3d 365, 369 (E.D. Va. 2017); *United States v. Henderson*, No. 15-162-1, 2015 WL 5813305, at *2 (E.D. Pa. Oct. 5, 2015); *United States v. Staton*, No. CR-05-2039-TUC-DCB, 2007 WL 79343, at *1 (D. Ariz. Jan. 9, 2007). I do not reach related issues under the Sentencing Guidelines.

was used to activate the Tripolitis card, and repeatedly used in connection with other fraudulent credit card accounts. (See pp. 9–10 & n.8, *supra*.)

Surveillance footage from Costco clearly showed Brown's face. (Ex. G 404 -1, -2, -3) Brown admitted in testimony that he was the person in the surveillance photo at Costco, and that he physically participated in the shopping spree. He denied, however, that he knew the $7,377.78 in purchases by his female companion (the cardholder, Febos, is female) were fraudulent. (Tr. 894–98)

More generally, for the reasons stated above, Brown was well aware that Banks-Oneal regularly stole credit cards from the mail, which she furnished to others, including Brown himself. Inferably, he had to know that the card, which was not in Banks-Oneal's name but was furnished by Banks-Oneal so that her friends could go on a shopping spree, was stolen.

The evidence was sufficient for the jury to infer that Brown participated in the scheme by which the women received the card from Banks-Oneal, that he called Chase to activate the card, and that he aided and abetted his female accomplice's opening of a Costco membership and use of the card in Febos's name to purchase $7,377.78 in merchandise.

Here, the Eighth Circuit case of *United States v. Mariano* is illustrative:

> The evidence also was sufficient for a jury to find that Mariano aided or abetted the use of the stolen Capital One credit card. The jury was instructed that it must find that the government had proved, beyond a reasonable doubt, "that someone committed each of the essential elements of the offense of bank fraud and aggravated identity theft" before Mariano could be found guilty of aiding or abetting the crime. Dutton's detailed testimony provided a sufficient basis for the jury to conclude that Dutton himself attempted to use the card, and that Mariano knowingly and deliberately associated himself with and participated in that crime.

729 F.3d 874, 883 (8th Cir. 2013).

Because neither the Rule 33 nor, *a fortiori,* the Rule 29 standard is satisfied, the motions are denied as to Counts 3 and 6.

**Count 4 (possession of stolen mail)**

Count 4 charges possession of stolen mail, in violation of 18 U.S.C. § 1708. *See* Section I.D, *supra*

Banks-Oneal, a postal employee, testified that she regularly met with Brown, would display stolen mail to him, and that he would select and purchase from her stolen mail items, including credit cards and U.S. Treasury checks. (*E.g.,* Tr. 438–42) From the close personal relationship of Banks-Oneal and Brown, the jury could also infer that Brown knew she was a postal employee. Her descriptions of the materials were such that anyone would have known this was mail matter addressed to other parties. That Brown knew the mail was stolen was corroborated by text messages, as outlined above. Banks-Oneal also testified that she bought the BMW from Brown, paying with cash and ten stolen credit cards. A detective testified that mail addressed to persons other than Brown was recovered from the "Berg" Infiniti, which was tied to Brown. (Tr. 534–43)

From this evidence, the jury easily and legitimately concluded that Brown knowingly possessed mail that was stolen.[11] Defendant's motion does not meet the Rule 33 weight-of-the-evidence standard, let alone the Rule 29 standard.

## IV.    Other Rule 33 Grounds

As noted, I have considered the Rule 29 motion together with related Rule 33 challenges in Section III, *supra*. Defendant also asserts two claims of legal errors at trial that he says would require a new trial under Rule 33. Neither is meritorious.

---

[11]    I reject defendant's argument that the particular pieces of stolen mail that were recovered were insufficiently tied to Banks-Oneal. But it is the stolen character of the mail that is critical to Count 4; the identity of the thief is not an element of a § 1708 offense. *See* Section I.D, *supra*. And the evidence proved, at a minimum, that the defendant would have known that this material was stolen mail.

### A. Verdict sheet

Defendant faults the court's denial of his request to include questions regarding the dollar amount of the actual and intended amount of the loss on the verdict sheet. The amount of loss, however, is not an element of these offenses. *See* Section I.B–F, *supra*. It therefore is not an issue for the jury. Rather, it is a sentencing issue for the Court. *See generally* U.S.S.G. § 2F1.1.[12] It was not error to decline to submit it to the jury, and the motion for a new trial on this basis is denied.

### B. Cross-examination regarding 2015 conviction

Defendant argues that he was deprived of a fair trial when the government inquired on cross-examination about his 2015 prior conviction. I disagree, finding that any arguable error was invited by the defendant himself.

By a pretrial motion in limine (DE 25), the government sought the court's ruling as to whether, if Brown testified, he could be impeached with (a) a 2015 Virginia felony conviction for forgery of a public document; and (b) a 2013 Virginia felony conviction for credit card theft. I reserved decision, subject to renewal if appropriate. (DE 30)[13]

After the government rested its case, I denied the defendant's Rule 29 motion for a judgment of acquittal, bringing to the fore the issue of whether the defendant would testify. I therefore *sua sponte* revisited the government's motion in limine and heard oral argument on that motion. I delivered an oral decision in which I granted exclusion of the earlier 2013 conviction, but permitted the use of the 2015 conviction for impeachment purposes only. (Tr.

---

[12]    Nor is the dollar amount an aggravating factor that would affect, e.g., the degree of the offense or the maximum punishment in a manner that would render it a jury issue under the principles of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).

[13]    The government apparently chose these two as the most pertinent or likely to be admitted. Defendant's criminal record included other convictions as well. The PSR places him in Criminal History Category IV.

836–41)[14] After discussion, counsel indicated that his client wished to testify, and I conducted a colloquy informing Mr. Brown of his rights and confirming that this truly was his own decision, reached after ample opportunity to consult with counsel. (Tr. 841–43)

Brown testified. He was a lively witness who, despite repeated admonitions, gave long, self-justifying narrative answers and proved somewhat hard to control. On direct examination by his own counsel, completely unprompted, Brown admitted both prior convictions by way of explanation for why he did not carry a gun (a question he had not been asked). (Tr. 858) When his counsel tried to rescue the situation, focusing the defendant on "a prior conviction," Brown interrupted: "I have—I have multiple prior convictions…." (*Id.*) Unbidden, he explained the circumstances of the 2015 conviction, offering by way of explanation that he was high on Ecstasy when he was arrested and signed his name "Bart Simpson." (*Id.*)

I then interrupted and attempted to throw the defendant a lifeline in the form of a *sua sponte* jury instruction:

> THE COURT: Okay. Let me just pause here for a moment. In response to Mr. LaPaglia's questions, the defendant has revealed a prior record. He's not on trial for that. Okay? And I want to be very clear about that. You know what the charges are in this case. And the only issue in this case is whether there's proof beyond a reasonable doubt of guilt of the charges in this case. And the defendant is not on trial for anything that he may or may not have done in the past. And I just want to make sure we're sticking to the issues here. Okay?

(Tr. 858–59)

The defendant, undeterred, immediately picked up where he had left off: "When I was 19, I caught a credit card fraud . . . ." (Tr. 859) The narrative continued for over a page of transcript. Hearing no objection from either side, I interrupted again, sua sponte:

---

[14]   That ruling properly cited the governing standards under Rule 609 and performed the necessary balancing.

THE COURT: Okay.

Once again, ladies and gentlemen, whatever counsel may bring out by his questioning, well, so be it. But we're talking about this case. You're not to hold against the defendant what might or might not have occurred in some other case. He's on trial for these charges, not some other charges. I just want to make sure everybody understands that. Okay?

(Tr. 860) The jury nodded, indicating that they understood. This was the second time I interjected, but not the last. (*See* Tr. 862, 864, 882, 894)

As to revealing past conviction(s), the barn door was wide open long before the government even began its examination. Impeachment, as such, was not really an issue any longer. Nevertheless, on cross-examination, the government confined itself to the 2015 conviction:

Q.   Were you honest in September 2015 when you were convicted of forgery of a public document in Virginia?

A.   Can you repeat that.

Q.   Were you honest in 2014 [*sic*] when you were convicted of public forgery -- pardon -- forgery of a public document in Virginia?

A.   Yes. I was high off -- Ecstasy when I signed that paper Bart Simpson; but yes, I was honest in -- I was high. So I wasn't deliberately doing that on purpose.

I didn't know, at the end of the day, what the people in there was asking me to sign. I didn't know it was a public document, record. I didn't know at the time what they were even putting in front of me. They knew that. They only put those charges on me at the end the day because I was being an A-hole to them.

I mean, I don't want to be disrespectful and say it, but I was just being disrespectful inside of the place because they kept asking me who was the person that sold the crack that day. And I didn't have anything to do with it. But I'm going to try to keep it as short as possible. You can go now.

Q.   Is your name Bart Simpson?

A.   No, Miss.

Q.      Did you sign your name -- did you sign the name Bart Simpson to a public document?

A.      I did while I was high. You're correct. Almost ten years ago.

(Tr. 897–98) No objection or motion to strike was asserted.

It is true that impeachment with a prior felony conviction ordinarily should not entail any delving into the underlying facts. *See United States v. Mitchell*, 427 F.2d 644, 647 (3d Cir. 1970). It is equally true that a defendant cannot complain of the elicitation of facts when he has "opened the door" to their consideration. *See, e.g., United States v. Kolodesh*, 787 F.3d 224, 231 (3d Cir. 2015); *United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1999); *United States v. West Indies Transport, Inc.*, 127 F.3d 299, 311 (3d Cir. 1997)*; Mitchell*, 427 F.2d at 647.

Here, the defendant did not merely allude to the facts underlying his prior conviction(s); he affirmatively invited consideration of them. He insisted on discussing them, both on his direct and cross examinations, in the apparent belief that he would blunt the effect of his prior conviction(s) or impress the jury with his candor. His own attorney apparently could not stop him, and he largely ignored the attempts of the Court, within its proper role, to rein him in.

The prosecution's later questions on cross-examination were thus well within bounds. Particularly pertinent here is the Eighth Circuit case of *United States v. Swanson*, which held that a defendant who described the facts underlying a prior conviction on direct examination had thereby opened the door to the prosecution's introduction of police reports rebutting the defendant's version:

> Although we acknowledge the general rule of impropriety of inquiry by the prosecutor into specific details surrounding prior convictions, "'[a] different situation is presented when an accused, on direct examination, attempts to explain away the effect of the conviction or to minimize his guilt. In such cases, the defendant may be cross-examined on any facts which are relevant to the direct examination.'" *United States v. Amahia*, 825 F.2d 177, 180 (8th Cir. 1987) (quoting *United States v. Wolf*, 561 F.2d 1376, 1381 (10th Cir. 1977)).

22

9 F.3d 1354, 1357 (8th Cir. 1993). Here, the prosecution's questions on cross-examination did not go so far as to challenge the defendant's version, as in *Swanson;* the government elicited no more than a reconfirmation of the defendant's unsolicited statements on direct examination.

In short, there was no error here. And whatever error might be found was surely blunted by my final instructions:

> Now, you have heard testimony that the defendant or perhaps other witnesses committed prior bad acts. It's important you understand this: The defendant is not on trial for committing other bad acts. You may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crimes charged. You must not consider this evidence as proof that the defendant has a bad character or is a bad apple or has a propensity to commit crimes. Specifically, you must not use this evidence to conclude that, because the defendant may have committed some other bad act in the past, that he must also have committed the acts charged in the indictment. Remember what the defendant is on trial for -- conspiracy to commit bank fraud, bank fraud, receipt and possession of stolen mail, aggravated identity theft -- not for those other acts. So do not return a guilty verdict unless the government proves the crimes charged in the superseding indictment beyond a reasonable doubt.

(Tr. 997)[15] On this basis, too, the motion for a new trial is denied.

---

[15]     Alternatively, by analogy to standards of review on appeal, any arguable error was surely harmless, and a fortiori did not constitute plain error. *See generally* Fed. R. Civ. P. 52; *Greer v. United States*, __ U.S. __, 141 S. Ct. 2090 (2021); *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770 (1993);  The evidence of guilt was multifarious and powerful, and the defendant's explanations were implausible and ill-considered.

## ORDER

For the reasons set forth above,

**IT IS** this 10th day of November, 2022,

**ORDERED** that the defendant's motion for a judgment of acquittal or for a new trial, pursuant to Fed. R. Crim. P. 29 and 33 (DE 54, 57), is **DENIED**.


/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

24